56 CCPA

The **UNITED STATES, Appellant,**

v.

**LONDON RECORDS, INC., Appellee.**

**Customs Appeal No. 5296.**

United States Court of Customs and Patent Appeals.

Nov. 14, 1968.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Andrew F. Vance, Chief, Customs Section, Steven R. Sosnov, New York City, for United States.

Barnes, Richardson & Colburn, New York City (Hadley S. King, Earl R. Lidstrom, New York City, of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND and BALDWIN, Judges.

ALMOND, Judge.

The United States appeals from the judgment of the United States Customs Court, First Division,[1] sustaining the importer's protest against the assessment of duty, claiming the imported merchandise to be free of duty under item 860.30 of the Tariff Schedules of

---

1. London Records, Inc. v. United States, 59 Cust.Ct. 104, C.D. 3087.

the United States. The merchandise involved consists of phonograph records which were classified and assessed for duty under item 724.25, Tariff Schedules of the United States, as phonograph records.

The tariff provisions involved read as follows:

724.25 Phonograph records (except those provided for in item 724.15) ...........................10% ad val.

860.30 Any sample (except samples covered by item 860.-10 or 860.20), valued not over $1 each, or marked, torn, perforated, or otherwise treated so that it is unsuitable for sale or for use otherwise than as a sample, to be used in the United States only for soliciting orders for products of foreign countries .......................Free

———◆———

It was stipulated by the parties that the phonograph records in issue are less than $1.00 each in value. It was conceded below by counsel for the importer (appellee here) that disc jockeys and radio stations do not solicit orders for the purchase of records and that the station is under no obligation to play any of the records which are received.

The undisputed factual situation as found by the court below and amply supported by the record is, in material substance, as follows: Appellee, London Records, Inc., is a subsidiary of Decca Record Company, Ltd., of London, England. The president and former executive vice-president of London Records, Inc., D. H. Toller-Bond, evincing his familiarity with his company's products, policies and practices, testified on behalf of plaintiff below that the business of London Records was to sell both foreign and domestically produced records, and that all of the records here involved were produced in England by Decca. Sample records were introduced in evidence as representative of the merchandise in issue. These records are contained in albums and have several selections on each side. A white label is affixed to each record bearing the catalog number. The label bears the words "Made in England—Not For Sale" and the letters "DJ" are inscribed next to the record number. These records are kept separate from the consumer or commercial records, the latter being identified by a red and silver label with only an LL number appearing thereon. The white label records are suitable for playing in their imported condition.

Mr. Toller-Bond further testified that, when the sample records are received from England, they are sent out to their distributors, to record reviewers, and to commercial and college radio stations throughout this country, with no charge being made for these distributions, the purpose being to achieve public exposure to create or stimulate a demand therefor.

It further appears from the record that radio stations are urged to, and disc jockeys frequently do, mention the title of the composition and the name of the artist. Reviewers write comments relating to the compositions which are published, having the effect of enlisting the attention of prospective purchasers and enabling identification at retail outlets.

The national promotion manager for album products at London Records, Thomas Virzi, testified on behalf of the company that at the time of importation he was personally responsible for, and in charge of, the distribution of the sample or white label records; that such records are distributed to reviewers and radio stations across the country; that he

determines the quantities that will go to various areas and that they are then sent to the promotional personnel of their distributors who in turn distribute them to the radio stations in their respective areas. In addition to preparing the list for distribution, the witness stated that he actually visited various radio stations and disc jockeys throughout the country, urging them to play the records given to them free of charge and that the promotional merchandise is not distributed to record stores. The witness further testified that radio stations do not normally mention the name of the company under whose label a record is issued.

In holding that the instant importation represents sample merchandise within the purview of item 860.30 of the tariff schedules and, as such, is free of duty, the Customs Court observed that the issue relating to the duty-free status of sample merchandise had been dealt with under substantially the same statutory language embodied in the provisions of paragraph 1821(a) and (b) of the Tariff Act of 1930, as amended by Public Law No. 85–211 (71 Stat. 486), citing Carson M. Simon & Co. v. United States, 46 Cust.Ct. 118, C.D. 2243; Italian Drug Importing Co. v. United States, 46 Cust.Ct. 243, C.D. 2263, and Swissedent International and Hoyt, Shepston & Sciaroni v. United States, 47 Cust.Ct. 174, C.D. 2298. These cases were cited by the parties below and are discussed in the briefs and arguments before us.

In *Simon*, a domestic company was the importer. The goods involved were samples of French and Italian wallpaper which were distributed, unsolicited, to decorators for the purpose of obtaining orders for the products exhibited. Claim was asserted for duty-free status under paragraph 1821, supra. The United States contended that inasmuch as ownership of the samples was invested in an American company, application of the statute was thereby precluded. The evidence revealed that the samples per se were not suitable for use as wallpaper.

The court examined the legislative history antedating the statute and held that there was no ownership restriction as contended by the United States and that the stated object and purpose was fulfilled where the distribution of the sample goods would result in the purchase of products of foreign manufacture.

The importations involved in *Italian Drug* were samples of vitamins of foreign manufacture distributed in this country by the manufacturer's agent to physicans who gave them free of charge to their patients. The goods bore the marking "Sample, not for sale." The record embodied a stipulation that the purpose behind the distribution practice was "to create a demand for such products." The court observed that notwithstanding the fact that a temporary benefit was derived by the patients to whom the vitamins were distributed free of charge, the importations were within the purview of paragraph 1821(a) and (b), as amended, supra, inasmuch as the result attained by the practice was based upon the object of securing future orders so that druggists and mercantile dispensers would stock them and thus the intent of the law as reasoned in the *Simon* case would be realized.

The *Swissedent* case, in brief, related to samples of artificial teeth which were distributed in this country to dentists and dental technicians for the purpose of securing orders to supply the needs of their professions. The Customs Court applied the rationale employed in the *Simon* and the *Italian Drug* cases and held the importations free of duty under paragraph 1821(a) and (b), as amended, supra.

In essence, the United States advances the same argument here upon which it relied below, the gist being that the samples have not been shown to have been used for solicitation purposes *only*. In substance it is asserted that the samples were used by radio stations and disc jockeys in promotion of their commercial purposes and interests and not, in the language of the statute "only for

soliciting orders for products of foreign countries."

 It is true that the physician, dentist, radio station or disc jockey may well have contributed to the enhancement of their professional or commercial interests in the instant case as well as the cases cited and discussed, since it must be assumed that the physician in the *Italian Drug* case was mindful of the welfare of his patient, and the "DJ" offered pleasing and acceptable entertainment. Neither per se solicited orders with more than a casual interest in the sale of the products. However, the controlling factor appears to be not what the radio station or disc jockey does, but, rather, whether the importer uses the samples "only for soliciting orders." The radio stations and disc jockeys were no more than a link in the "chain of solicitation." We view their role, as did the court below, "as incidental and wholly subordinate to what plainly appears as the sole *motivating* purposes behind the importation and distribution of the samples—creation of demand for future orders."

It would seem to follow as a logical consequence that the creation of a demand for a medicinal property would be predicated upon its application or use for its intended purpose. So in the instant case the imported sample records must be heard in order to stimulate sales. If there is a more efficacious method of appealing to the aesthetical appreciation of radio listeners, the record before us is devoid of suggestion.

We have considered and assessed the arguments of counsel but we must agree, however, with the rationale employed by the Customs Court:

> * * * that the "chain of solicitation" revealed by the facts in this case is sufficiently analogous to that present in the *Italian Drug* case, supra, so as to require the same result. In that case physicians were contacted as the natural mediums for reaching potential

users and purchasers of the product represented by the sample. In the instant situation, disc jockeys with their radio shows stand in a similar position with respect to their natural entré to the record-buying public. In both cases, the purpose of the distribution was to create a demand for the products through exposure to public consumption.

The judgment is affirmed.

Affirmed.